UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

EDWARD DELMAN,

                *Plaintiff,*

– against –

MICHAEL GATTO; PATRICIA HANRAHAN-GATTO,
*Trustees of the Gatto Family Revocable Trust*,

                *Defendants.*

**MEMORANDUM & ORDER**
23-cv-03524 (NCM) (AYS)

---

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Edward Delman brings this action against Michael Gatto and Patricia Hanrahan-Gatto, as trustees of the Gatto Family Revocable Trust. *See* Compl., ECF No. 1-1. Plaintiff brings a single claim of negligence for injuries suffered from a trip and fall that occurred on the defendants' property while plaintiff was living there as a tenant. Defendants move for summary judgment on plaintiff's claim pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motion is DENIED.

## BACKGROUND

Plaintiff and his girlfriend, Wendy Toranto, viewed the premises at 14 Bonnybill Drive, Centereach, New York ("Bonnybill Property") as a prospective rental in the summer of 2021. Counter 56.1 ¶¶ 1, 5; Mot. Summ. J. Ex. B ("Delman Dep. Tr.") 13:14–

15, 14:7–14; Mot. Summ. J. Ex. D ("Text Thread") 1, ECF No. 28-7.[1] At the time the couple viewed the property, it was being leased by another tenant, whom Toranto knew. Counter 56.1 ¶ 4. The couple was interested in renting the property and began corresponding with the owners, Michael Gatto and his wife, Patricia Hanrahan-Gatto ("defendants"). *See* Counter 56.1 ¶ 7. The parties exchanged communications regarding the lease of the property, with Toranto and Gatto serving as the main communicators between the two couples. *See generally* Text Thread.

On July 1, 2021, defendant Gatto emailed Toranto a draft lease for the Bonnybill Property. Text Thread 1.[2] Plaintiff testified that he signed some version of the lease, and text messages from Toranto to Gatto on July 7, 2021 stated "[w]e signed [the] lease." *See* Delman Dep. Tr. 14:23–15:10, 50:13–21, ECF No. 28-5; Text Thread 3. Toranto also informed Gatto that she had attempted to send the signed lease to him. Text Thread 3. Gatto responded on the same day, informing Toranto that he had not received the signed lease, and she responded that she would try to send it again. Text Thread 3. Gatto testified that he never received the signed lease. Mot. Summ. J. Ex. C ("Gatto Dep. Tr.") 12:2–7, ECF No. 28-6.

At his deposition, Gatto was presented with an unsigned lease, which Gatto testified "appear[ed] to be the lease that [he] asked [plaintiff and Toranto] to sign." Gatto Dep. Tr. 13:4–18. Gatto could not say whether the unsigned lease was the "exact version"

---

[1] The facts contained herein are undisputed unless otherwise indicated, and are taken from the parties' statements pursuant to Local Civil Rule 56.1, specifically defendants' 56.1 statement ("56.1"), *see* ECF No. 28-1, plaintiff's counter 56.1 statement ("Counter 56.1"), *see* ECF No. 29-1, and defendants' response to plaintiff's counter 56.1 statement ("56.1 Reply"), *see* ECF No. 31.

[2] Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

2

of the lease that Gatto had signed and sent to the couple. Gatto Dep. Tr. 12:9–21, 13:19–23. Plaintiff Delman was not shown a copy of any lease agreement during the course of his deposition; however, he did testify that he had signed a lease with defendants. *See* Delman Dep. Tr. 50:13–15.

Despite Gatto having never received a signed lease from plaintiff and Toranto, the couple moved into the Bonnybill Property in July 2021. At the time the couple moved in, plaintiff understood that the property was old, run-down, and in need of "a good fixing." Counter 56.1 ¶ 8. Upon move-in, plaintiff provided defendants with a list of issues with the property, and plaintiff testified that he informed defendants that the back patio was in disrepair and was a hazard. *See* Delman Dep. Tr. 18:5–10, 23:22–25. Defendants deny that plaintiff and Toranto complained about the back patio upon move in. *See* 56.1 Reply ¶ 52.

Nevertheless, the parties agreed that plaintiff would "fix up the inside of the house," and that defendants would reimburse him for expenses. Counter 56.1 ¶ 41. Where plaintiff and Toranto undertook work themselves, such as ripping up old carpet and painting the inside of the home, they performed the work without compensation and were reimbursed for the cost of the materials by defendants. *See* Counter 56.1 ¶¶ 44, 49. Where contractors performed work on the house, those contractors were hired and paid by Gatto. Counter 56.1 ¶¶ 46–48, 54–56; Gatto Dep. Tr. 21:9–21. The process for identifying the contractor for hire appears to have been informal. For example, Gatto testified that when there was an issue with the furnace, "[plaintiff] was kind enough to find the right contractor to [fix] that," but that other times it appears Gatto chose the contractors. Gatto Dep. Tr. 21:15–22:5, 25:18–26:6. Some of those contractors had connections to either defendants or plaintiff. For example, the front stoop of the property was replaced by

3

Gatto's brother-in-law, and plumbing work was provided by Toranto's son. Counter 56.1 ¶¶ 46, 48. Gatto paid his brother-in-law and Toranto's son directly. *See* Counter 56.1 ¶¶ 46, 48.

The Bonnybill Property also contained a studio apartment that was not included in the space for lease, and which defendants retained for their own use. Counter 56.1 ¶¶ 29, 31; Summ. J. Opp'n Ex. A ("Hanrahan-Gatto Dep. Tr.") 20:3–24, ECF No. 29-3. Plaintiff and Toranto did not have access to the studio apartment. *See* Gatto Dep. Tr. 29:13–16; Hanrahan-Gatto Dep. Tr. 22:6–8.

Three months after moving into the property, in October 2021, plaintiff claims that he tripped and fell on a defect in the back patio. Counter 56.1 ¶¶ 9, 14, 50; Delman Dep. Tr. 26:20–23; Gatto Dep. Tr. 11:20–23. Defendants describe the defect as a "crack" in the back patio, while plaintiff describes the defect as "more so a hole [than] a crack." Counter 56.1 ¶ 9. Whether a "hole," or a "crack," plaintiff claims he was injured by tripping on the defect while carrying a mattress out of the house with Toranto. Counter 56.1 ¶ 11. Following plaintiff's fall, the parties discussed replacing the back patio. Counter 56.1 ¶ 16. It is unclear from the record whether these conversations were precipitated by the fall. Nevertheless, in April 2022, Toranto provided defendants with the name and contact information for a contractor and estimates for replacing the back patio. Counter 56.1 ¶ 18. Shortly afterwards, the old back patio with the defect was removed, and a new cement slab was poured. Counter 56.1 ¶ 19. This contractor was hired and paid by Gatto, who testified that the back patio was replaced to mitigate risk of injury to plaintiff. Counter 56.1 ¶ 57.

4

During some time in 2022, it appears the parties' relationship soured, and defendants attempted to remove plaintiff and Toranto from the property. *See* Gatto Dep. Tr. 57:12–17.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021).[3] Facts are in genuine dispute when "the jury could reasonably find for" the non-moving party based on the evidence in the record. *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

The movant "bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). Where the moving party meets their burden, the non-moving party must provide sufficient evidence establishing a genuine issue of material fact beyond "[t]he mere existence of a scintilla of evidence." *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012). The court need only consider admissible evidence, and is not obligated to conduct an independent review of the record to identify a factual dispute. *Looney v. Macy's Inc.*, 588 F. Supp. 3d 328, 340 (E.D.N.Y. 2021).

---

[3] Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

5

## DISCUSSION

Plaintiff brings a one-count complaint for negligence, alleging that defendants violated their duty to maintain the premises at the Bonnybill Property in a reasonably safe condition. *See* Compl. ¶¶ 6–17. Defendants move for summary judgment on this count, arguing that pursuant to the terms of the parties' lease agreement, defendants were out-of-possession landlords who retained no responsibility for general maintenance defects at the property and thus cannot be held liable for plaintiff's injuries. Mot. Summ. J. ("Mot.") 9–10, ECF No. 28-2.

This action was brought in New York state court and removed pursuant to the Court's diversity jurisdiction. *See* Not. of Removal, ECF No. 1. Federal courts sitting in diversity generally apply the substantive law of the forum state. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). Thus, the Court looks to New York law in deciding defendants' motion for summary judgment. In New York, "[l]iability for a dangerous condition on property is generally predicated on ownership, occupancy, control, or special use of the property." *Amparo v. Christopher One Corp.*, 207 N.Y.S.3d 133, 137 (2d Dep't 2024). In general, "the owner of real property owes a duty to maintain that property in a reasonably safe condition." *Id.*

However, where the owner of real property has leased the property to another, and thus has "transferred possession and control," the owner is considered an "out-of-possession" landlord that does not have liability for injuries arising from defects on the premises. *Henry v. Hamilton Equities, Inc.*, 34 N.Y.3d 136, 142 (2019). Therefore, to hold a landlord liable "for injuries occurring on leased premises due to a dangerous or defective condition," the plaintiff must show that the landlord "retained control over the premises," or that he or she "is contractually or statutorily obligated to repair and maintain the

6

premises." *Beeker v. Islip U-Slip LLC*, No. 09-20630, 2014 WL 3739247, at *2 (N.Y. Sup. Ct. July 10, 2014).

To make out a prima facie case of landlord liability based on the landlord's exercise of control of the premises, the plaintiff must offer evidence that the landlord's retention of control created an "ability to remedy a dangerous or defective condition," which "may be evidenced with proof of a past course of conduct demonstrating the landlord assumed the responsibility to maintain and repair the property." *Beeker*, 2014 WL 3739247, at *2. When considering whether a landlord retained a duty to remedy dangerous defects on a premises, "it is the relationship between those two parties—the landlord and the tenant—as reflected in their agreements regarding the maintenance of the property, that drives the analysis." *Henry*, 34 N.Y.3d at 145.

Here, the parties dispute whether they entered into a binding written lease agreement that controls the analysis of which party had a duty to maintain the premises. Defendants argue that the parties did enter into a valid agreement, and that by the terms of the agreement, defendants retained no duty to maintain the premises. Reply in Supp. of Mot. Summ. J. ("Reply") 3, ECF No. 30. In opposition to defendants' motion for summary judgment, plaintiff argues that there is no valid, written and signed lease agreement by which defendants transferred responsibility for maintenance defects to plaintiff and Toranto as tenants. Summ. J. Opp'n 3 ("Opp'n"), ECF No. 29.[4] In the

---

4    As part of this argument, plaintiff argues that any lease agreement violates the statute of frauds because it was not signed, and is thus void and unenforceable. Opp'n 3. In reply, defendants assert that "[t]here is no factual dispute that the written lease existed and the parties agreed to be bound by it." Reply 5. New York's statute of frauds requires that a "contract for the leasing for a longer period than one year . . . of any real property . . . is void unless the contract . . . expressing the consideration, is in writing, subscribed by the party to be charged, or by his lawful agent thereunto authorized by

7

alternative, plaintiff argues that the terms of the lease and the parties' course of conduct show that defendants retained responsibility for repairing defects on the property, such as the defect in the back patio that allegedly led to plaintiff's injury for which he brings suit. Opp'n 4–13.

As questions of fact exist as to the agreement between the parties, the Court finds that summary judgment as to plaintiff's negligence claim is inappropriate.

## I. The Written Lease Agreement

First, the Court finds that the written lease attached to defendants' motion for summary judgment has not been properly authenticated and therefore declines to rely on it to determine the lease terms that control the parties' agreement as to the Bonnybill Property. Next, even assuming that the written lease does control the parties' agreement,

---

writing." N.Y. Gen. Oblig. Law § 5-703(2). Therefore, a contract for the "long-term lease of real property" must be "signed by the party to be charged, i.e., the party against whom enforcement is sought." *Vista Props., LLC v. Rockland Ear, Nose & Throat Assocs., P.C.*, 875 N.Y.S.2d 248, 249 (2d Dep't 2009). There is some inconsistency in the New York courts as to whether the statute of frauds may be satisfied by a missing writing. *See Walker v. Carter,* 210 F. Supp. 3d 487, 500 (S.D.N.Y. 2016). The Third and Fourth Departments have held that parol evidence may not be introduced to prove the existence of a missing written agreement and thus satisfy the statute of frauds, unless the failure to produce the writing is adequately explained or its existence is admitted by an adversary. *Id.* However, the First and Second Departments have adopted a more permissive approach, whereby parol evidence of a writing may be introduced to prove the writing's existence. *Id.*

Here, neither party has been able to locate a signed version of the lease agreement although there is testimony to suggest that there is some version of the lease that was signed by both parties. *See* Delman Dep. Tr. 50:13–15; 14:25–15:3 ("Q: Do you have a copy of a lease that you actually signed? A: Yes."). Even if the Court were to adopt the more permissive approach of the First and Second Departments, which would allow defendants to introduce extrinsic evidence to determine whether the parties executed a lease agreement in compliance with the statute of frauds, it would not result in a finding in defendants' favor. Instead, this evidence must be introduced and evaluated by the factfinder. For purposes of this order, the Court makes no findings as to whether the parties' agreement satisfied the statute of frauds.

8

the Court finds that the written lease is at least ambiguous as to which party was responsible for curing maintenance defects on the property and thus summary judgment is inappropriate.

### A. Improper Authentication of Lease Agreement

Defendants contend that there "is no factual dispute that the written lease existed and the parties agreed to be bound by it." Reply 5. In support of this proposition, defendants attached a lease agreement to their motion for summary judgment which contains the parties' names and refers specifically to the Bonnybill Property. *See* Mot. Summ. J. Ex. A ("Lease") 1, ECF No. 28-4. This copy of the lease does not contain plaintiff's signature, but it was signed by Gatto on July 7, 2021. *See* Lease 5. However, the version of the lease which was presented to Gatto during his deposition, and which he testified seemed to be the lease he sent to plaintiff and Toranto for their signatures, was unsigned by either party. Therefore, defendants' exhibit is not the same copy of the lease that was presented to Gatto during his deposition. *See* Gatto Dep. Tr. 13:13–15 ("Q: The version we have in front of us is not signed by you or them; is that correct? A: That is correct from what I see here."). Accordingly, the lease presented to the Court is not the same version of the lease which Gatto testified reflected his understanding of the terms of the parties' agreement. *See* Gatto Dep. Tr. 16:20–17:9.

At the summary judgment stage, "material relied on . . . need not be admissible in the form presented to the district court." *Xu v. City of New York*, No. 21-1059-cv, 2023 WL 4285031, at *3 (2d Cir. June 30, 2023), *cert. denied sub nom.*, *Xu v. City of New York*, 145 S. Ct. 272 (2024). Instead, so "long as the evidence in question will be presented in admissible form at trial, it may be considered on summary judgment." *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017). To be considered on summary judgment,

9

documentary evidence must therefore be authenticated or capable of being authenticated. *Axelrod & Cherveny, Architects, P.C. v. T. & S. Builders Inc.*, 943 F. Supp. 2d 357, 363–64 (E.D.N.Y. 2013). Pursuant to Federal Rule of Evidence 901, authentication is satisfied where the proponent produces "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The bar for authentication of evidence "is not particularly high" and depends on a "context-specific determination whether the proof advanced is sufficient[.]" *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014).

Defendants have failed to show that the lease attached as Exhibit A is capable of being authenticated, and thus should be accepted by the Court as the written agreement between the parties. As noted by plaintiff in his counterstatement of material facts, it is unclear from the record what version of the lease plaintiff signed. Counter 56.1 ¶ 2. The lease attached as Exhibit A was not presented to any party at deposition who identified it as the lease signed by the parties. The lease defendant Gatto was presented with at his deposition was unsigned, while the lease attached to defendants' summary judgment motion contains defendant Gatto's signature. *See* Gatto Dep. Tr. 13:13–15 ("Q: The version we have in front of us is not signed by you or them; is that correct? A: That is correct from what I see here."); Lease 5 (containing Gatto's signature and dated July 7, 2021). Plaintiff was not presented with any lease document at his deposition. *See generally* Delman Dep. Tr. Defendants offer no explanation as to why the lease attached as its exhibit is not the same document that was presented to and authenticated by Gatto at his deposition.

While aspects of the attached lease suggest that this may be a version of the intended agreement between the parties for the Bonnybill Property, review of the text

10

messages exchanged between Taranto and Gatto reflect that the parties may have exchanged multiple versions of the lease. For example, on July 2, 2021, Taranto texted Gatto that she and plaintiff had reviewed the lease and "everything looks good" but that there was "one thing we had a question about," and the parties agreed to a phone call. Text Thread 2. The next correspondence on the same text thread reflects that Taranto and plaintiff had signed the lease and were attempting to send it to Gatto. Text Thread 3. The record does not clarify whether there were any agreed upon changes to the lease following the phone call. However, Gatto did testify that the same lease had been used with the prior tenant of the Bonnybill Property, but that changes had been made to the version that was sent to plaintiff and Toranto. Gatto Dep. Tr. 10:18–21; 16:5–19 ("[O]n the last page the additional requirements or amendments, other provisions, those would have been different.").

The Court is particularly unwilling to assume that the lease attached as Exhibit A is the version of the lease plaintiff signed because Gatto testified that he drafted this lease "over a number of years," and that he used some version of the same lease with other properties he owned. Gatto Dep. Tr. 14:3–6. Additionally, defendant Gatto testified that he "could not be sure" that the lease he was presented at his deposition was the same version that he himself had signed and sent to plaintiff for signature, and which is presumably the version before the Court. *See* Gatto Dep. Tr. 13:13–23 ("Q: This would have been the version of the lease that you might have . . . signed in PDF form? A: Something similar. I can't say it is the exact version.").

Therefore, the exhibit attached to defendants' motion for summary judgment has not been presented to any party with knowledge to confirm that it is the version of the lease that was sent by Gatto and signed by plaintiff and Toranto. *Cf. LM Ins. Corp. v.*

11

*Safety Nat'l Cas. Corp.*, 695 F. Supp. 3d 270, 287–88 (E.D.N.Y.), *reconsideration denied*, 705 F. Supp. 3d 83 (E.D.N.Y. 2023), *appeal withdrawn sub nom.*, *LM Ins. Corp. v. Cincinnati Ins. Co.*, No. 23-7628, 2024 WL 4746267 (2d Cir. Feb. 12, 2024) (finding testimony that a document reflected the agreement between two parties sufficient for authentication when the copy was both presented to witness and attached as the exhibit). Thus, the Court has no evidence from which to conclude that the lease attached to defendants' summary judgment motion as Exhibit A is the copy of the lease that contained the parties' agreement and which plaintiff signed.

Accordingly, the Court concludes that questions of fact remain as to the provisions of the written lease signed by plaintiff, and thus summary judgment is inappropriate on the record before the Court.

### B. Ambiguous Terms of Lease Agreement

Even if defendants had established that the lease agreement they submitted was the agreement sent by defendant Gatto and signed by plaintiff, the lease is ambiguous as to which party was responsible for curing the defect in the back patio. Viewed in the light most favorable to the plaintiff as the nonmoving party, the contract presented to the Court by defendants and the parties' course of conduct during the lease term support the inference that defendants assumed responsibility for curing dangerous defects on the premises. Thus, even assuming the lease submitted by defendants as an exhibit is capable of being properly authenticated, and even if there were no dispute regarding whether this agreement reflected the written lease between the parties, summary judgment would not be appropriate.

Defendants claim they are merely out-of-possession landlords with no contractual duty to repair the premises or cure dangerous defects. In support of this argument,

defendants cite several cases that stand for the well-established proposition that an out-of-possession landlord is not liable for general maintenance defects. Mot. 9 (citing *N. G. v. DRF Mgmt. Corp.*, 203 N.Y.S.3d 157 (2d Dep't 2024)). A landlord "is not generally liable for negligence with respect to the condition of property after possession and control of the property is transferred to a tenant unless the landlord is either contractually obligated to make repairs or maintain the premises, or the landlord has a contractual right to reenter, inspect, and make needed repairs at the tenant's expense and liability is based on a significant structural or design defect that is contrary to a specific statutory safety provision." *Ebrahim v. Twin Dev., LLC*, 237 A.D.3d 610, 610 (1st Dep't 2025). New York courts have found that where an out-of-possession landlord retains only a general right of re-entry to a property, the right of re-entry does not create an affirmative duty to cure maintenance defects. *See, e.g.*, *Hausmann v. UMK, Inc.*, 744 N.Y.S.2d 404, 404 (1st Dep't 2002).

Therefore, whereby the terms of a lease agreement, the landlord transfers the duty for repair and maintenance to the tenants, and the defect giving rise to an injury falls under the tenant's duties, the out-of-possession landlord will not be liable for injuries caused by that defect. *See Manning v. N.Y. Tel. Co.*, 157 A.D.2d 264, 266–69 (1st Dep't 1990) (finding out-of-possession landlord with general right of reentry not liable for slip and fall on over-polished floor where lease agreement stipulated tenant would be responsible for maintenance and repair of floor coverings). However, "[w]hen an out-of-possession landlord retains some control and some contractual duty to make repairs to the leased premises, the question of liability will turn on whether the injury-producing condition fell within the landlord's contractual responsibilities." *N. G. v. DRF Mgmt. Corp.*, 203 N.Y.S.3d 157, 159 (2d Dep't 2024).

13

Assuming for the purposes of this analysis that the lease agreement before the Court constitutes the parties' agreement, the Court must look first to the terms of the lease to determine whether the agreement assigned responsibility for general maintenance defects at the Bonnybill Property to plaintiff or defendants. Where a dispute "focuses on contested contract terms, and those terms are clear and unambiguous, their proper interpretation is a question of law for the Court to decide rather than a question of fact for a jury to decide." *Crane Co. v. Coltec Indus. Inc.*, No. 98-cv-08838, 1999 WL 38251, at *2 (S.D.N.Y. Jan. 28, 1999), *aff'd*, 171 F.3d 733 (2d Cir. 1999). However, where "the language of a contract is ambiguous, its construction presents a question of fact that may not be resolved by the court on a motion for summary judgment." *Shadlich v. Rongrant Assocs., LLC*, 887 N.Y.S.2d 228, 229 (2d Dep't 2009). "A contract is ambiguous if the terms are susceptible to more than one reasonable interpretation." *Hong v. Renval Constr., LLC*, 194 N.Y.S.3d 541, 542 (2d Dep't 2023).

Here, a right of re-entry is contained at Section 15 of the lease, titled "Access." Lease 2. This section states that the "[l]andlord reserves the right to enter the premises during reasonable hours for the purposes of inspection and to show prospective purchasers and/or lessees" and that the tenants "acknowledge[] and agree[] to the necessity for landlord access for business purposes." Lease 2. Additionally, Section 35(K) of the lease reserves for the landlord the right to arrange for maintenance services should they be deemed necessary upon the landlord's inspection. Lease 4.

Other aspects of the lease indicate that defendants were responsible for remedying defects in the premises. For example, Section 8 of the lease, titled "Maintenance," states that "[i]n the event of maintenance problems not caused by the Tenant(s), they shall immediately be reported in writing to the Landlord for repair and/or resolution." Lease

14

2. Defendants argue that this provision only delegated "financial responsibility" for maintenance problems to the landlord, whereby the tenant continued to "possess and control access to the premises for the purpose of making the repairs." Reply 5. Defendants' argument is belied by the language of the lease, as Section 8 states simply that maintenance problems will be reported to the landlord for repair and/or resolution, with no limitation on the landlord's responsibility as simply "financial." Lease 2. Another reasonable interpretation of this section is that, upon notification by the tenant to the landlord of a maintenance problem not caused by the tenants, the landlord was responsible to repair or otherwise resolve the issue. The Court therefore finds this section of the lease agreement to be ambiguous, as its language does not dictate as a matter of law that it was plaintiff's responsibility to address maintenance problems.

Though the agreement is subject to multiple interpretations, the Court next looks to the parties' course of conduct to determine whether defendants have established that they relinquished complete control over the Bonnybill Property to plaintiff such that they cannot be held liable for defects on the premises. *See Gronski v. County of Monroe*, 18 N.Y.3d 374, 380–81 (2011) ("[W]hen a landowner and one in actual possession have committed their rights and obligations with regard to the property to a writing, we look not only to the terms of the agreement but to the parties' course of conduct . . . to determine whether the landowner in fact surrendered control over the property such that the landowner's duty is extinguished as a matter of law.").

## II. Course of Conduct

When "assessing an out-of-possession landowner's duty in tort, the court should look not only to the terms of the agreement but also the parties' course of conduct." *Santiago v. City of New York*, 169 N.Y.S.3d 671, 673–74 (2d Dep't 2022); *see also Henry*,

15

34 N.Y.3d at 144–45 ("[The Court of Appeals] has confirmed that the degree of control retained over the property by the landlord remains an important consideration."). Here, a trier of fact could determine that the parties' course of conduct during the lease term reflects that all parties believed that defendants retained a duty to keep the premises in a reasonably safe condition.

For example, defendant Gatto testified that during the lease term, he paid an arborist to trim trees on the property so that there was no danger of large limbs falling on the house, *see* Gatto Dep. Tr. 22:6–8, replaced the storm doors and front stoop of the home, Gatto Dep. Tr. 22:9–12, and replaced the back patio upon Toranto's request, Gatto Dep. Tr. 29:22–31:13. For the arborist, defendant Gatto "handled all of that," including not only paying for the tree trimming but hiring the contractor and coordinating the timing of the trimming. Gatto Dep. Tr. 25:15–26:6.

Further, plaintiff testified that he and Toranto informed defendants that the back patio was in disrepair when they first moved into the property. *See* Delman Dep. Tr. 23:22–25. Gatto testified that he was not informed that the back patio presented a hazard until after plaintiff's trip and fall on the back patio defect. *See* Gatto Dep. Tr. 40:18–21, 42:19–43:7, 56:3–19. Nevertheless, upon notification by Toranto about the back patio defect, Gatto set up "immediate mitigation . . . to remove the hazard" and then had the entire back patio removed and replaced. Gatto Dep. Tr. 37:22–38:6. Gatto specifically testified that he took these steps to "mitigate any possibility of injury to" plaintiff. Gatto Dep. Tr. 38:12–16. Additionally, Gatto testified that neither plaintiff nor Toranto had "responsibility to fix any sort of cracks or defects in the surface of the back patio that might have existed in October of 2021." Gatto Dep. Tr. 41:17–21.

Thus, a reasonable finder of fact could determine, based on evidence of the parties' course of conduct while plaintiff and Toranto were tenants on the property, that defendants retained responsibility to cure maintenance defects.

\*     \*     \*

Therefore, viewing the evidence in the light most favorable to plaintiff as non-movant, both the terms of the lease agreement and the parties' course of conduct gives rise to the reasonable inference that the parties intended defendants to be responsible for maintenance defects on the premises, and that defendants had a duty to repair the defect in the back patio. Thus, summary judgment is inappropriate.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is DENIED. In accordance with the Court's Individual Practice Rule IV.A, the parties shall file a proposed joint pretrial order by August 1, 2025.

**SO ORDERED.**

　　　　　　　　　　　　　　　　　　_/s/ Natasha C. Merle_
　　　　　　　　　　　　　　　　　　NATASHA C. MERLE
　　　　　　　　　　　　　　　　　　United States District Judge

Dated:　　　July 2, 2025
　　　　　　Brooklyn, New York